** SECTION 362 INFORMATION SHEET **

10-51699-gwz
DEBTOR

Chapter 7
Case No.: 10-51699-gwz

Wells Fargo Bank, N.A.
MOVANT
PROPERTY INVOLVED IN THIS MOTION: 1620 Sterling Way , Reno NV 89512

NOTICE SERVED ON: Debtor(s) ☒ : Debtor (s) Counsel ☒ : Trustee ☒

DATE OF SERVICE: _____

| MOVING PARTY'S CONTENTIONS: | DEBTOR'S CONTENTIONS: |
|---|---|
| **The EXTENT and PRIORITY of LIENS:** | **The EXTENT and PRIORITY of LIENS:** |
| 1ˢᵗ Wells Fargo Bank, N.A.$129,567.74 (PB) | 1ˢᵗ _____ |
| Total Encumbrances: $129,567.74 | 2ⁿᵈ _____ |
| APPRAISAL or OPINION as to VALUE: | Total Encumbrances: $ _____ |
| "Per attached valuation from www.zillow.com" $82,000.00 | APPRAISAL or OPINION as to VALUE: |

The EXTENT and PRIORITY of LIENS:

1ˢᵗ Wells Fargo Bank, N.A.$129,567.74 (PB)

Total Encumbrances: $129,567.74

APPRAISAL or OPINION as to VALUE:
"Per attached valuation from www.zillow.com"
  $82,000.00

---

### TERMS OF MOVANT'S CONTRACT WITH THE DEBTOR

Amount of Note: $135,000.00
Interest Rate: 6.25
Duration: 30 Year
Payment Per Month: $ 831.22
Date of Default: September 1, 2010
Amount of Arrearages:

| | |
|---|---|
| 6 Monthly Payments at $959.05 (June 1, 2010 - March 1, 2011) | $5,754.30 |
| Property Inspections | $64.09 |
| Corporate Advance | $1,509.65 |
| Motion for Relief Filing Fee | $150.00 |
| Attorneys Fees | $550.00 |
| Demand Fee | $200.00 |
| Accrued Late Fees | $498.72 |
| Suspense Amount | ($287.56) |
| **Total** | **$8,439.20** |

SPECIAL CIRCUMSTANCES: **The undersigned hereby certifies that an attempt has been made to confer with debtor(s) counsel, or with debtor(s) and that more than two (2) business days have expired, and that after sincere effort to do so, counsel has been unable to resolve this matter without court action.**

SUBMITTED BY: _____

SIGNATURE: _____

---

### DEBTOR'S CONTENTIONS:

### OFFER OF "ADEQUATE PROTECTION" FOR MOVANT:

SPECIAL CIRCUMSTANCES:

SUBMITTED BY: _____

SIGNATURE: _____

**TIFFANY & BOSCO, P.A**
Gregory L. Wilde, Esq.
Nevada Bar No. 004417
212 South Jones Boulevard
Las Vegas, Nevada 89107
Telephone:  702 258-8200
Fax:  702 258-8787
glw@tblaw.com

Wells Fargo Bank, N.A.
10-72000

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| In Re: | Bk Case Number: 10-51699-gwz |
|---|---|
| Jose Baca-Espinosa and Dinora Baca | Date:    4/12/2011<br>Time:   10:00 am |
| | Chapter 7 |
| Debtors. | |

## MOTION FOR RELIEF FROM AUTOMATIC STAY

Wells Fargo Bank, N.A., Secured Creditor herein, ("Secured Creditor" or "Movant"

hereinafter), alleges as follows:

1.     That on or about May 5, 2010, the above named Debtors filed this instant Chapter 7

Petition in Bankruptcy with the Court.

2.     Secured Creditor is the current payee of a promissory note dated May 25, 2007 in the

principal sum of $135,000.00 ("Promissory Note" herein), secured by a Real Property Trust Deed of

same date ("Trust Deed" herein) upon property generally described as 1620 Sterling Way, Reno, NV

89512, and legally described as follows:

All that certain real property situate in the City of RENO, County of Washoe, State of Nevada,
described as follows:

Lot 15 in Block A of STERLING VILLAGE NO. 2, according to the map thereof, filed in the
office of the County Recorder of Washoe County, State of Nevada, on August 29,   1958, as
File No. 29 18 J 7, as Tract Map No. 596.

("subject property" herein).

Attached hereto as Exhibit "A" are the Deed of Trust, Note and merger documents.

3.    Secured Creditor is informed and believes, and, based upon such information and belief, alleges that title to the subject property is currently vested in the name of Debtors.

4.    Secured Creditor previously filed a Motion For Relief of Automatic Stay on May 18, 2010. Debtor remitted several payments and Secured Creditor was order to offer a workout for the remaining default. Court denied Secured Creditors Motion without prejudice on or about January 24, 2011.

5.    On or about January 14, 2010 Secured Creditor sent an Order Re: Adequate Protect to the Debtor. This order proposed to spread the default over a 6 month period to allow Debtor to cure the default and maintain current monthly payments. Attached hereto as Exhibit "B" is the proposed Order Re: Adequate Protection.

6.    Debtor failed to execute and return the proposed order. On February 24, 2011 Secured Creditor sent a Demand Letter advising debtor of the current default and its intentions to proceed with a Motion For Relief of Automatic Stay.

7.    Debtor responded to demand letter with a letter dated March 1, 2011 advising that they were unable to complete the Order RE: Adequate Protection as they were not able to make the payments. Debtor's Response to Demand Letter is attached hereto as Exhibit "C".

8.    Debtor's Schedule J (attached hereto as Exhibit "D") indicates that the debtor has a negative disposable income of -$1,754.00.

9.    Secured Creditor is informed and believed and based on such information and belief asserts that considering Debtor's negative disposable income there is no means for the debtor to become current on their default and believes that filing a Motion For Relief of Automatic stay is the only recourse available.

///

///

///

10. Immediately prior to the filing of this Motion. the status of payment towards the Secured Creditor's note was as follows:

    a. The current monthly payment under the note is $959.05.

    b. The most recent payment received by the Secured Creditor was on March 2, 2011 in the amount of $1,000.00.

    c. Pursuant to the terms of the note and general accounting principles, this payment was applied to the September 1, 2010 payment.

    d. The Secured Creditor has also incurred Attorneys Fees of $550.00 and a filing fee of $150.00 which are part of the total arrears below.

    e. The current amount due and owing is as follows:

| | |
|---|---|
| 6 Monthly Payments at $959.05 (June 1, 2010 - March 1, 2011) | $5,754.30 |
| Property Inspections | $64.09 |
| Corporate Advance | $1,509.65 |
| Motion for Relief Filing Fee | $150.00 |
| Attorneys Fees | $550.00 |
| Demand Fee | $200.00 |
| Accrued Late Fees | $498.72 |
| Suspense Amount | ($287.56) |
| Total | $8,439.20/ |

through 3/9/2011 12:00:00 AM with another payment coming due on the first (1st) day of every month thereafter. and a late charge becomes due on any payment not paid within fifteen (15) days from the date the monthly payment is due. Secured Creditor will provide an update of the above information for the Court and interested parties if there is an opposition filed or upon written request to undersigned counsel. Attached hereto as Exhibit "E" is a copy of the Post Petition Payment History.

11. Movant is informed and believes and therefore alleges that the Debtors and bankruptcy estate have insufficient equity in the property. The fair market value of the property pursuant to Zillow is $82,000.00. less ten percent (10%) cost of marketing. less the first secured lien resulting in insufficient equity. Therefore. secured creditor is not adequately protected. A true and correct copy of the Zillow is attached hereto as Exhibit "F".

12.     Secured Creditor has not initiated foreclosure proceedings on the Property with respect to the subject Trust Deed.

13.     Secured Creditor urges that this Court issue and Order herein permitting this Secured Creditor to proceed to a Foreclosure Sale of the Property. including necessary action to obtain possession of the Property.

14.     Secured Creditor's Information Sheet as to the extent of liens and encumbrances against the subject property is attached hereto as the "Coversheet" and incorporated herein by reference. Secured Creditor will seek leave of Court to specify any further encumbrances against the subject property at the time of hearing.

15.     Jeri Coppa-Knudson has been appointed by this Court as the Chapter 7 Trustee in this instant Bankruptcy proceeding.  To the extent the relief sought herein is granted the Trustee should be bound by any such judgment.

16.     This Court has jurisdiction of this action pursuant to the provisions of 11 U.S.C. Section 362(d).

17.     Secured Creditor asserts that a foreclosure proceeding has not been initiated concerning the subject property.  As a result. Secured Creditor asks the Court to waive the requirement of notifying other lien holders as detailed in Local Rule 4001 (a)(1).  Such lien holders will be notified of a foreclosure proceeding if and when one is initiated.

WHEREFORE. Secured Creditor prays judgment as follows:

(1)     For an order granting relief from the Automatic Stay, and permitting this Secured Creditor to move ahead with foreclosure proceedings under this Secured Creditor's Trust Deed and to sell the subject property at a Foreclosure Sale under the items of said Trust Deed, including necessary action to obtain possession of the Property.

(2)     In the alternative. an Order requiring the Debtors to reinstate and maintain all obligations due under all of the trust deeds encumbering the subject property and further allowing Secured Creditor with the remedies to proceed with foreclosure should the Debtor not maintain payments.

(3)    For attorneys' fees and costs of suit incurred herein.

(4)    For such other and further relief as this Court deems appropriate.

DATED _____.

TIFFANY & BOSCO, P.A

By _____ #10235

**GREGORY L. WILDE, ESQ.**
Attorney for Secured Creditor
212 South Jones Boulevard
Las Vegas, Nevada 89107

Assessor's Parcel Number:
**007-054-19**
Return To:
**WACHOVIA MORTGAGE CORPORATION**
**1100 Corporate Center Dr (NC4723)**
**Raleigh, NC 27607**

Prepared By:

Recording Requested By:

——————————— [Space Above This Line For Recording Data] ———————————

# DEED OF TRUST    MIN 100013700078696307

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.
(A) "**Security Instrument**" means this document, which is dated **May 25, 2007**
together with all Riders to this document.
(B) "**Borrower**" is **JOSE A BACA  AND,DINORA M BACA**

Borrower is the trustor under this Security Instrument.
(C) "**Lender**" is **WACHOVIA MORTGAGE CORPORATION**

NEVADA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    **Form 3029 1/01**
**WITH MERS**
(VMP) **-6A(NV)** (0510)        *J. A. B.*        **7869630-00**
Page 1 of 15        Initials: *D m B*
VMP Mortgage Solutions, Inc.

Exhibit A

Lender is a **A Corporation**
organized and existing under the laws of **NORTH CAROLINA**
Lender's address is
**1100 Corporate Center Dr., Raleigh, NC 27607-5066**
(D) "Trustee" is TRSTE, INC.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated **May 25, 2007**
The Note states that Borrower owes Lender **One Hundred Thirty-Five Thousand and No/100**
                                                                                    **Dollars**
(U.S. $     **135,000.00**     ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than      **June 1, 2037**          .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

S.A.S. 7869630-00
Initials: Dm.B

-6A(NV) (0510)                              Page 2 of 15                              Form 3029   1/01

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** [Type of Recording Jurisdiction] of **WASHOE** [Name of Recording Jurisdiction]:

**SEE SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF**

| Parcel ID Number: **007-054-19** | | which currently has the address of |
| **1620 STERLING WAY** | | [Street] |
| **RENO** | [City], Nevada **89512** | [Zip Code] |

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

$\mathcal{S}.A.\mathcal{S}$ 7869630-00
Initials: $\mathcal{S}.m.\mathcal{B}$

-6A(NV) (0510)        Page 3 of 15        Form 3029 1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds

Initials: ᒐ.ᗩ.ᗷ.  ᗪ.ᗰ.ᗷ    ᒐ.ᗩ.ᗷ. 7869630-00

⊛ -6A(NV) (0510)                    Page 4 of 15                    **Form 3029  1/01**

for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

S. A B. 7869630-00
Initials:D.m.B.

-6A(NV) (0510)                    Page 5 of 15                    Form 3029  1/01

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

J. A. S.  7869630-00
Initials: D.m.B.

@ -6A(NV) (0510)          Page 6 of 15          Form 3029  1/01

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position

J.A.B. 7869630-00
Initials: D.m.B.

-6A(NV) (0510)                Page 7 of 15                Form 3029  1/01

in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the**

J. A. G.  7869630-00
Initials: D. m. G.

-6A(NV) (0510)                              Page 8 of 15                              Form 3029  1/01

Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

S. A.B.  7869630-00
Initials: Dm B.

-6A(NV) (0510)                    Page 9 of 15                    Form 3029  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations

S.A.B.  7869630-00
Initials D.m.B.

@-6A(NV) (0510)                    Page 10 of 15                    Form 3029  1/01

contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18,** "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the

J.A.B. 7869630-00
Initials: Dm B

-6A(NV) (0510)                    Page 11 of 15                    Form 3029 1/01

address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use, or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup

J.A.B 7869630-00
Initials: Dm.B

-6A(NV) (0510)  Page 12 of 15  Form 3029 1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Assumption Fee. If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $ •
•One percent of the outstanding principal balance, with a minimum of $400 and a maximum of $900.

Ɔ-A.B. 7869630-00
Initials: D.m.B.

⊕-6A(NV) (0510)                    Page 13 of 15                    Form 3029  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          JOSE A BACA                   -Borrower


_____          _____ (Seal)
                                          DINORA A BACA                 -Borrower


_____ (Seal)              _____ (Seal)
                -Borrower                                                -Borrower


_____ (Seal)              _____ (Seal)
                -Borrower                                                -Borrower


_____ (Seal)              _____ (Seal)
                -Borrower                                                -Borrower


                                                              7869630-00

-6A(NV) (0510)              Page 14 of 15                    Form 3029  1/01

3540526 Page 16 of 17 06/05/2007 11:31:55 AM

**STATE OF NEVADA**
COUNTY OF Washoe

This instrument was acknowledged before me on May 31, 2007                    by

Jose a. Baca & Denora M. Baca



Mail Tax Statements To:
WACHOVIA MORTGAGE CORPORATION
1100 Corporate Center Drive
Raleigh, North Carolina 27607-5066

CINDY COMSTOCK
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 92-3697-2 - Expires June 8, 2008

J.A.B. 7869630-00
Initials: D.M.B.

-6A(NV) (0510)                    Page 15 of 15                    Form 3029  1/01

## EXHIBIT A
## LEGAL DESCRIPTION

Escrow No.07002276 AE
All that certain real property situate in the City of RENO, County of Washoe, State of Nevada, described as follows:

Lot 15 in Block A of STERLING VILLAGE NO. 2, according to the map thereof, filed in the office of the County Recorder of Washoe County, State of Nevada, on August 29, 1958, as File No. 291817, as Tract Map No. 596.

APN: 007-054-19

NOTE

I hereby certify that this instrument is a
true and correct copy of the original.
By: _____
BACA
Ticor Title of Nevada, Inc.

May 25, 2007            RENO                    NV
      [Date]                          [City]                    [State]

1620 STERLING WAY, RENO, NV 89512

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   135,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
**WACHOVIA MORTGAGE CORPORATION**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.2500    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   first    day of each month beginning on   July 1, 2007        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   June 1, 2037        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1100 Corporate Center Dr., Raleigh, NC 27607-5066**

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $   831.22    .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

7869630-00

Wolters Kluwer Financial Services
VMP®-5N (0207).01
Page 1 of 3

Form 3200 1/01

Initials: Om B
S. A. B.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  **15**  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **05** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**7869630-00**

Form 3200 1/01
Initials: D.m.B.

S.A.B.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JOSE A BACA                -Borrower

_____ (Seal)
DINORA N BACA              -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

[Sign Original Only]

7859630-00

VMP®-5N (0207).01                    Page 3 of 3                    Form 3200 1/01

MAR. 19. 2010  7:19AM      BANKRUPTCY                          NO. 654    P. 2

## SECRETARY'S CERTIFICATE

## WACHOVIA BANK, FSB
(to be known as Wells Fargo Bank South, National Association)

I, Hope Armstrong Howe, an Assistant Secretary of Wachovia Bank, FSB, a federal savings bank, to be converted to a national banking association organized pursuant to the laws of the United States of America and to be known as Wells Fargo Bank South, National Association (the "Bank") hereby certify that the following resolutions were duly adopted by the Board of Directors of the Bank by Written Consent in Lieu of a Meeting dated as of October 27, 2009, and that said resolutions have not been amended or revoked and remain in full force and effect on the date hereof:

### Resolutions Regarding Conversion
### to a National Banking Association

WHEREAS, Golden West Financial Corporation, as the sole shareholder of the Bank, has approved and authorized the conversion of the Bank (the "Conversion") from a Federal savings bank into a national banking association expected to be named "Wells Fargo Bank South, National Association" ("WFBS-NA")";

WHEREAS, in connection with the Conversion, WFBS-NA, as a national banking association, is required to adopt Articles of Association, Bylaws and an Organization Certificate;

WHEREAS, in furtherance of the Conversion, the Board finds it in the best interest of the Bank and its shareholder to adopt, effective as of the effective time of the Conversion, Articles of Association, Bylaws and an Organization Certificate for the national banking association;

NOW THEREFORE BE IT RESOLVED, that the Conversion is hereby authorized and approved;

FURTHER RESOLVED, that the Articles of Association attached hereto as Exhibit A, the Bylaws attached hereto as Exhibit B, and the Organization Certificate attached hereto as Exhibit C, be, and each hereby is, approved and adopted (the foregoing collectively referred to as the "National Bank Organizational Documents");

FURTHER RESOLVED, that the directors and officers of the Bank be, and each hereby is, authorized and directed to execute and deliver the National Bank Organizational Documents and to take such actions necessary in order to complete the Conversion;

FURTHER RESOLVED, that upon the effective time of the Conversion, each outstanding share of the Bank shall automatically be converted into a share of WFBS-NA;

#695290

FURTHER RESOLVED, that the form of stock certificate for WFBS-NA representing shares of the capital stock of WFBS-NA, a copy of which is attached hereto as Exhibit D, is in all respects approved and adopted as the form of certificate to represent WFBS-NA's shares of capital stock;

RESOLVED FURTHER, that all officers of the Bank in existence immediately prior to the Conversion shall continue to serve, as officers of WFBS-NA following the Conversion;

RESOLVED FURTHER, that the officers of the Bank be, and each hereby is, authorized and directed, on behalf of the Bank, to take such actions and to cause to be prepared, executed and filed with any federal, state, local or foreign governmental or regulatory authority as may be necessary or appropriate, such applications, declarations, powers, notices, reports, statements and other documents, and any amendments and supplements thereto, to respond to all requests for additional information and to meet or confer, or to cause legal advisors to meet and confer, with officials of any federal, state, local or foreign governmental or regulatory authority, as may be necessary or advisable to carry out and effectuate the intent and purposes of the foregoing resolutions, and

FURTHER RESOLVED, that any actions heretofore or hereafter taken by any officer of the Bank relating to, and consistent with, the subject matter of these resolutions be, and each hereby is, authorized, ratified, confirmed and approved in all respects.

## Resolutions to Approve Agreement and Plan of Merger with Wells Fargo Bank South Central, N.A. (t/b/e on or about 11/1/09)

RESOLVED that the Agreement and Plan of Merger by and between Wachovia Bank, FSB (a federal saving bank to be converted to a national banking association with the title Wells Fargo Bank South, National Association) (the "Bank"), and Wells Fargo Bank South Central, National Association ("WFB-SC") (the "Agreement"), in substantially the form attached hereto as Exhibit E, with such changes therein as the officers signing said Agreement shall approve, which Agreement provides for the merger of the Bank with and into WFB-SC, under the charter and title of WFB-SC, be and the same hereby is approved, and that any officer of the Bank at the level of Vice President or above, whose signature shall be attested to by the Secretary, any Assistant Secretary, or the Cashier of this Bank, be and they hereby are authorized and directed to execute such Agreement in the name and on behalf of this Bank and that the officers of this Bank be and they hereby are authorized to take any and all such action as may be necessary or proper to make effective such merger, including without intent to impair the generality of the foregoing, the preparation, execution and presentation of applications, representations and information to, and agreements with, the Federal Deposit Insurance Corporation, the Comptroller of the Currency and any other government agencies or supervisory authorities, and the amendment of said Agreement in any manner approved by the Federal Deposit Insurance Corporation, the Comptroller of the Currency and any other government agencies or supervisory authorities, and making no substantial change in the

#695290

plan of merger for the purpose of procuring any approvals, consents, rulings or opinions necessary to make effective such merger.

RESOLVED that the Agreement be presented for approval by the shareholders of this Bank, and that the Board hereby recommends that the shareholders approve the Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Bank this 29th day of October, 2009.

(Bank Seal)

*Hope Armstrong Howe*

Hope Armstrong Howe
Assistant Secretary

#695290

**CERTIFICATION OF
UNANIMOUS WRITTEN CONSENT OF SOLE SHAREHOLDER
WACHOVIA BANK, FSB
(to be known as Wells Fargo Bank South, National Association)**

I, Hope Armstrong Howe, an Assistant Secretary of Golden West Financial Corporation, a corporation organized pursuant to the laws of the State of North Carolina (the "Corporation"), do hereby certify that:

1.  Attached hereto is a true and correct copy of the "Unanimous Written Consent of Sole Shareholder of Wachovia Bank, FSB (to be known as Wells Fargo Bank South, National Association)" duly adopted by the Corporation as sole shareholder of Wachovia Bank, FSB (to be known as Wells Fargo Bank South, National Association) ("WBFSB") on October 29, 2009.

2.  Said Unanimous Written Consent of Sole Shareholder is still in full force and effect and has not been amended or revoked as of the date hereof.

3.  As Assistant Secretary of the Corporation, I hereby certify that the Corporation, as sole shareholder of WBFSB, consented to the Agreement and Plan of Merger providing for the merger of WBFSB with and into Wells Fargo Bank South Central, National Association.

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Corporation this 29th day of October, 2009.

(Corporate Seal)

_Hope Armstrong Howe_
Hope Armstrong Howe
Assistant Secretary

C:\Documents and Settings\A-J10056\Application Data\Hummingbird\DM\Temp\LGP2-#695306-v1-WBFSB_sole_shareholder_approval_merger_and_cert.DOC

## UNANIMOUS WRITTEN CONSENT OF SOLE SHAREHOLDER
### OF
### WACHOVIA BANK, FSB
(to be known as Wells Fargo Bank South, National Association)

The undersigned, being the owner of all outstanding shares of common stock of Wachovia Bank, FSB, a Federal Savings Bank in the process of converting to a national banking association organized pursuant to the laws of the United States of America, and with the title of Wells Fargo Bank South, National Association (the "Bank"), hereby waives the right to notice and holding of a shareholder's meeting to consider and vote upon the merger of the Bank with and into Wells Fargo Bank South Central, National Association, and hereby approves the Agreement and Plan of Merger, attached hereto as Exhibit A, providing for the merger under the provision of the laws of the United States, and subject to the approval of the Comptroller of the Currency.

GOLDEN WEST FINANCIAL
CORPORATION

Dated: October 29, 2009          By: _____

                                        Donna M. Harris
                                        Vice President

## SECRETARY'S CERTIFICATE

## WELLS FARGO BANK SOUTH CENTRAL, NATIONAL ASSOCIATION

I, Patricia A. Ruedenberg, the Secretary of Wells Fargo Bank South Central, National Association, a banking association organized pursuant to the laws of the United States of America (the "Bank") hereby certify that the following resolutions were duly adopted by the Board of Directors of the Bank by Unanimous Written Consent dated as of] October 26, 2009, and that said resolutions have not been amended or revoked and remain in full force and effect on the date hereof:

### Approve Agreement and Plan of Merger for Merger with Wachovia Bank, FSB (to be known as Wells Fargo Bank South, N.A. (t/b/a on or about 11/1/09)

RESOLVED, that the Agreement and Plan of Merger by and between Wachovia Bank, FSB (a federal saving bank to be converted to a national banking association with the title Wells Fargo Bank South, National Association) ("WBFSB"), and Wells Fargo Bank South Central, National Association (the "Bank") (the "Agreement"), in substantially the form attached hereto as Exhibit A, with such changes therein as the officers signing said Agreement shall approve, which Agreement provides for the merger of WBFSB with and into the Bank, under the charter and title of the Bank, be and the same hereby is approved, and that any officer of the Bank at the level of Vice President or above, whose signature shall be attested to by the Secretary, any Assistant Secretary, or the Cashier of this Bank, be and they hereby are authorized and directed to execute such Agreement in the name and on behalf of this Bank and that the officers of this Bank be and they hereby are authorized to take any and all such action as may be necessary or proper to make effective such merger, including without intent to impair the generality of the foregoing, the preparation, execution and presentation of applications, representations and information to, and agreements with, the Federal Deposit Insurance Corporation, the Comptroller of the Currency and any other government agencies or supervisory authorities, and the amendment of said Agreement in any manner approved by the Federal Deposit Insurance Corporation, the Comptroller of the Currency and any other government agencies or supervisory authorities, and making no substantial change in the plan of merger for the purpose of procuring any approvals, consents, rulings or opinions necessary to make effective such merger; and

RESOLVED, that the Agreement be presented for approval by the shareholders of this Bank, and that the Board hereby recommends that the shareholders approve the Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Bank this 28th day of October, 2009.

(Bank Seal)

_____
Secretary

CERTIFICATION OF
UNANIMOUS WRITTEN CONSENT OF SOLE SHAREHOLDER
OF
WELLS FARGO BANK SOUTH CENTRAL, NATIONAL ASSOCIATION

I, Robert L. Lee, an Assistant Secretary of Wells Fargo & Company, a Delaware corporation (the "Corporation"), do hereby certify that:

1.  Attached hereto is a true and correct copy of the "Unanimous Written Consent of Sole Shareholder of Wells Fargo Bank South Central, National Association" duly adopted by the Corporation as sole shareholder of Wells Fargo Bank South Central, National Association (the "Bank") on October 28, 2009.

2.  Said Unanimous Written Consent of Sole Shareholder is still in full force and effect and has not been amended or revoked as of the date hereof.

3.  As an Assistant Secretary of the Corporation, I hereby certify that the Corporation, as sole shareholder of the Bank, consented to the Agreement and Plan of Merger providing for the merger of the Wachovia Bank, FSB (to be known as Wells Fargo Bank South, National Association) into the Bank.

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Corporation this 28th day of October, 2009.

(Corporate Seal)                                       _____
                                                       Assistant Secretary

S:\RUED>0\Wachovia Burgundwe24_WBSSB\WF3SNA\WFBSCNA\N12712&WFBSC UWC-SH Approval doc

**UNANIMOUS WRITTEN CONSENT**
**OF SOLE SHAREHOLDER**
**OF**
**WELLS FARGO BANK SOUTH CENTRAL,**
**NATIONAL ASSOCIATION**

The undersigned, being the owner of all outstanding shares of common stock of Wells Fargo Bank South Central, National Association, a banking association organized under the laws of the United States of America (the "Bank"), hereby waives the right to notice and holding of a shareholder's meeting to consider and vote upon the merger of Wachovia Bank, FSB (to be known as Wells Fargo Bank South, National Association) into the Bank, under the charter and title of the Bank, and hereby ratifies and confirms the Agreement and Plan of Merger attached hereto as Exhibit A, providing for the merger under the provision of the laws of the United States, and subject to the approval of the Comptroller of the Currency.

WELLS FARGO & COMPANY

Dated:  October 28, 2009

By _____
Laurel A. Holschuh
Senior Vice President

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (the "Merger Agreement") is dated as of October 30, 2009, by and between WACHOVIA BANK, FSB (to be known as WELLS FARGO BANK SOUTH, NATIONAL ASSOCIATION ("WBFSB"), and WELLS FARGO BANK SOUTH CENTRAL, NATIONAL ASSOCIATION ("WFB South Central").

### RECITALS

WBFSB and WFB South Central acknowledge and confirm the following:

(a)    WBFSB is a federally chartered saving bank, having its principal office and place of business at 2005 Taylor Street, Houston, Texas 77077. As of June 30, 2009, WBFSB had capital stock of $150,000, divided into 15,000 shares of common stock, with a par value of $10 per share ("WBFSB Common Stock"), and surplus of $1,843,200, retained earnings of $50,700, and accumulated other comprehensive income of $0.

(b)    WFB South Central is a national banking association organized and existing under the laws of the United States of America, having its main office at 301 W. Northern Lights Blvd., Anchorage, Alaska 99503. As of June 30, 2009, WFB South Central had capital stock of $1,500,000, divided into 15,000 shares of common stock, with a par value of $100 per share, ("WFB South Central Common Stock"), surplus of $1,928,000, retained earnings of $213,000, and accumulated other comprehensive income of $0.

### [WBFSB Ownership][1]

(c)    Wachovia Corporation ("Wachovia") is a Delaware corporation, having its principal office at One Wachovia Center, 301 S. College Street, Charlotte, North Carolina 28288. Wachovia owns 100 percent of the issued and outstanding shares of common stock of Golden West Financial Corporation ("Golden West"). Golden West is a North Carolina corporation, having its principal office at One Wachovia Center, 301 S. College Street, Charlotte, North Carolina 28288. Golden West owns 100 percent of the issued and outstanding shares of common stock of WBFSB.

### [WFB South Central Ownership]

(d)    Wells Fargo & Company ("Wells Fargo") is a Delaware corporation having its principal office at 420 Montgomery Street, San Francisco, California 94104. Wells Fargo owns 100 percent (15,000 shares) of the issued and outstanding shares of WFB South Central Common Stock.

---

[1] Immediately prior to consummation of this transaction, it is contemplated that Wachovia Corporation and Golden West Financial Corporation will be either liquidated, dissolved or merged out of existence. Therefore Wachovia Bank, FSB will be owned 100% by Wells Fargo & Company at the time that this transaction is consummated.

(e)    Wells Fargo owns 100 percent of the issued and outstanding shares of Wachovia.

(f)    A majority of the Board of Directors of each of WBFSB and WFB has duly approved the merger of WBFSB with and into WFB (the "Merger") and has authorized the execution of this Merger Agreement.

(g)    It is the intent of the parties hereto to effect a corporate reorganization which qualifies as a tax-free reorganization pursuant to Section 368(a)(1)(A) of the Internal Revenue Code.

## AGREEMENTS

In consideration of the premises and pursuant to the authority of and in accordance with the provisions of 12 U.S.C. §215a, the parties hereto agree as follows:

## SECTION 1

1.1    WBFSB shall be merged with and into WFB South Central under the charter of WFB South Central. (WBFSB and WFB South Central may be collectively referred to herein as the "Merged or Merging Banks").

1.2    The Merger shall be effective as of 12:06 a.m. Eastern time, on the date specified in the certificate of approval to be issued by the Comptroller of the Currency of the United States, under the seal of his office, approving the Merger (the "Effective Date").

## SECTION 2

The name of the receiving association (the "Association") shall be "Wells Fargo Bank South Central, National Association."

## SECTION 3

The business of the Association shall be that of a national banking association and shall be conducted at the main office of the Association, which shall be located at 2005 Taylor Street, Houston, Texas 77077, and at its legally established branches.

## SECTION 4

The Association shall have 15,000 shares of common stock authorized, with a par value $100 per share, of which 15,000 shares shall be issued and outstanding, and at the time the merger shall become effective the Association shall have a surplus of $3,770,400.

2

## SECTION 5

As of the Effective Date:

5.1     The corporate existence of each of the Merging Banks shall be merged into and continued in the Association, and the Association shall be deemed to be the same corporation as each of the Merging Banks.

5.2     All assets, rights, franchises, and interests of the Merging Banks in and to every type of property (real, personal and mixed) and choses in action shall be transferred to and vested in the Association by virtue of the Merger without any deed or other transfer.  The Association, upon the Merger and without any order or other action on the part of any court or otherwise, shall hold and enjoy all rights of property, franchises, and interests, including appointments, designations, and nominations, and all other rights and interests as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, and in every other fiduciary capacity, in the same manner and to the same extent as such rights, franchises, and interests were held or enjoyed by each of the Merging Banks at the time of Merger.

5.3     The Association shall be liable for all liabilities of every kind and description, including liabilities arising out of the operation of a trust department, of each of the Merging Banks existing immediately prior to the Effective Date.

## SECTION 6

6.1     Subject to the provisions of 12 U.S.C. §215a regarding rights of dissenting shareholders, the shares of common stock of the Merging Banks issued and outstanding immediately prior to the Effective Date shall, as of the Effective Date, by virtue of the Merger automatically and without any action of the part of the holders thereof, be converted as follows:

(a)     The presently outstanding 15,000 shares of WFB South Central Common Stock owned by Wells Fargo shall continue as 15,000 outstanding shares of common stock of the Association, each of $100 par value, which shares shall be fully paid and non-assessable.

(b)     The presently outstanding 15,000 shares of WBFSB Common Stock owned by Golden West, shall be deemed cancelled.  Shares of WBFSB Common Stock thereafter surrendered to the Association shall be cancelled and no further transfers or registry of WBFSB Common Stock shall occur after the Effective Date.  Inasmuch as the issued and outstanding shares of WBFSB Common Stock are owned by Golden West in percentages equal to their ownership of WFB South Central, no provision is made for the manner and basis of converting the shares of WBFSB Common Stock held by Golden West into securities of the Association or of another corporation or, in whole or in part, into money or property.

3

6.2    From and after the Effective Date, there shall be no transfers on the stock transfer books of the Merging Banks of the shares of WBFSB Common Stock or WFB South Central Common Stock which were issued and outstanding immediately prior to the Effective Date.

## SECTION 7

7.1    As of the Effective Date, the Articles of Association of the Association shall read in their entirety as set forth in the attached Appendix A hereto, and the Association shall be authorized under such Articles of Association to issue 15,000 shares of common stock, with a par value of $100 per share.

7.2    The By-laws of WFB South Central as they exist at the Effective Date shall continue in full force and effect as the By-laws of the Association until altered, amended, or repealed as provided therein or as provided by law.

7.3    The board of directors of WFB South Central as they exist at the Effective Date shall continue to serve as the board of directors of the Association until the next annual meeting of the shareholders, or until such time as their successors have been elected and have qualified.

7.4    The officers of WFB South Central as they exist at the Effective Date shall continue as the officers of the Association for the term prescribed in the By-laws, or until the Board of Directors otherwise shall determine.

## SECTION 8

8.1    The Merger shall be subject to and conditioned upon the following:

(a)    approval of this Merger Agreement by the shareholders of each of the Merging Banks as required by law; and

(b)    approval of the Merger by all appropriate banking and regulatory authorities and the satisfaction of all other requirements prescribed by law necessary for consummation of the Merger.

8.2    At any time before the Effective Date, this Merger Agreement may be terminated, notwithstanding any prior shareholder vote or approval:

(a)    by mutual consent of the Boards of Directors of the Merging Banks if consummation of the Merger would be inadvisable in the opinion of said Boards; or

(b)    by action of the Board of Directors of any party hereto if the Merger shall not have been consummated by March 31, 2010.

4

## SECTION 9

9.1     At any time before the Effective Date, the Merging Banks, by mutual consent of
their respective Boards of Directors, may amend this Merger Agreement, provided, however, that
no such amendment shall affect the rights of the shareholders of any Merging Bank that has
approved this Merger Agreement in a manner which is materially adverse to such shareholders.

9.2     This Merger Agreement may be executed in several counterparts, each of which
shall be deemed an original, but all of which together shall constitute one and the same
instrument.

[THE REMAINDER OF THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK.]

IN WITNESS WHEREOF, WBFSB and WFB South Central have caused this Merger Agreement to be executed by their respective duly authorized officers and their corporate seals to be hereunto affixed as of the date first above written, pursuant to a resolution of each Merging Bank's Board of Directors, acting by a majority thereof.

WACHOVIA BANK, FSB
(to be known as WELLS FARGO BANK SOUTH, NATIONAL ASSOCIATION)

(CORPORATE SEAL)

By: _____
     Donna M. Harris
Its:   Vice President

Attested By:

_____
Hope Armstrong Howe, Assistant Secretary

STATE OF North Carolina )
                     ) ss
COUNTY OF Mecklenburg )

On this ____ day of October, 2009, before me, a Notary Public for the State and County aforesaid, personally came Donna Harris, as Vice President and Hope A. Howe, as Asst Secretary of WACHOVIA BANK, FSB (to be known as WELLS FARGO BANK SOUTH, NATIONAL ASSOCIATION), and each in his or her said capacity acknowledged the foregoing instrument to be the act and deed of said bank and the seal affixed thereunto to be its seal.

WITNESS my official seal and signature this day and year aforesaid.

(Seal of Notary)

_____
Notary Public
My Commission Expires ___7/21/2013___

6

WELLS FARGO BANK SOUTH CENTRAL,
NATIONAL ASSOCIATION

(BANK SEAL)

By: _____
    James E. Hanson
Its:   Executive Vice President and CFO

Attested By:

_____
Patricia A. Ruedenberg, Secretary

STATE OF MINNESOTA   )
                  ) ss
COUNTY OF HENNEPIN   )

On this 28th day of October, 2009, before me, a Notary Public for the State and County aforesaid, personally came James E. Hanson as Executive Vice President and CFO, and Patricia A. Ruedenberg as Secretary of WELLS FARGO BANK SOUTH CENTRAL, NATIONAL ASSOCIATION, and each in his or her said capacity acknowledged the foregoing instrument to be the act and deed of said bank and the seal affixed thereunto to be its seal.

WITNESS my official seal and signature this day and year aforesaid.

(Seal)   LORI L. BOECKEL-KREIDT
      Notary Public - Minnesota
      My Commission Expires Jan. 31, 2010

_____
Notary Public
My Commission Expires 1-31-2010

1

2

3

4

5

6
WILDE & ASSOCIATES
Gregory L. Wilde. Esq.
Nevada Bar No. 004417
212 South Jones Boulevard
Las Vegas, Nevada 89107
Telephone:  702 258-8200
Fax:  702 258-8787
Wells Fargo Bank, N.A.
10-72000

7

8

9

10

## UNITED STATES BANKRUPTCY COURT

11

## DISTRICT OF NEVADA

12

13

14    In Re:                                          BK-S-10-51699-gwz

15    Jose A. Baca and Dinora M. Baca                 MS Motion No.
                                                      Date:
16                                                    Time:

17                                                    Chapter 7

18                    Debtors.

19

## ORDER RE ADEQUATE PROTECTION

20

21          Secured Creditor's Motion for Relief from the Automatic Stay having come on for hearing

22    in the above-entitled Court, all appearances as noted on court record, and based upon all the

23    papers and pleadings on file herein and good cause appearing therefore,

24

25

26


Exhibit __B__

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the debtors will cure the

post-petition arrearages currently due as follows:

| | |
|---|---|
| 1 Monthly Payment | $964.77 |
| (August 1, 2010) | |
| 5 Monthly Payments at $959.05 | $4,795.25 |
| (September 1, 2010 - January 1, 2011) | |
| 6 Late Charges at $41.56 | $249.36 |
| (August 1, 2010 - January 1, 2011) | |
| Property Inspections | $105.00 |
| Motion for Relief Filing Fee | $150.00 |
| Attorneys Fees | $550.00 |
| Suspense Amount | ($211.38) |
| Total | $6,603.00 |

The total arrearage shall be paid in six monthly installments. Each install shall be

in the amount of in the amount of $1,100.50 and shall be in addition to the regular monthly

payment and shall be due on or before the 20th day of the month commencing with the February

20, 2011 payment and continuing throughout and concluding on or before July 20, 2011.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Debtors shall resume

and maintain the regular monthly payments in a timely fashion, outside of any Bankruptcy Plan,

beginning with the February 1, 2011, payment, on Secured Creditor's Trust obligation,

encumbering the subject Property, generally described as 1620 Sterling Way , Reno, NV 89512,

and legally described as follows:

> All that certain real property situate in the City of RENO, County of Washoe, State of
> Nevada, described as follows:
> Lot 15 in Block A of STERLING VILLAGE NO. 2, according to the map thereof, filed in
> the office of the County Recorder of Washoe County, State of Nevada, on August 29,
> 1958, as File No. 29 18 J 7, as Tract Map No. 596.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that if the Debtors fail to make

any payments as stated in this Order, or fail to maintain the regular monthly payments on Secured

Creditor's obligation, allowing the normal grace period, then Secured Creditor may file and serve

upon Debtors and Debtors' counsel, a fifteen (15) Day Notice Declaration Re Breach of Condition.

For each such Declaration Re Breach of Condition filed, there shall be assessed an attorney fees of

$100.00, to be paid by the Debtors upon any reinstatement. If upon the sixteenth (16th) day Debtors

have failed to cure the delinquency, then Secured Creditor may submit to this Court an Order

vacating the automatic stay as to Secured Creditor, and Secured Creditor may thereafter proceed

with enforcing its Security interest in the subject Property, pursuant to applicable State Law, and take any action necessary to obtain complete possession thereof.

Submitted by:

WILDE & ASSOCIATES

By_____
     **GREGORY L. WILDE, ESQ.**
     Attorneys for Secured Creditor
     212 South Jones Boulevard
     Las Vegas, Nevada 89107

APPROVED AS TO FORM & CONTENT:

Jeri Coppa-Knudson               Pro Se

By_____     By_____

Jeri Coppa-Knudson               Pro Se
Chapter 13 Trustee               Attorney for Debtors
3495 Lakeside Drive
Reno, NV 89509-4841

                                      Nevada Bar No._____

March 1st 2011

To: TIFFANY & BOSCO. P.A.
GREGORY L. WILDE
212 SOUTH JONES BLVD.
LAS VEGAS, NV 89107

In reference of the letter that I received on the date of February 24. I had been trying to communicate with you until now. This with the the end to make you understand that the amount you are asking for each month is 2.000 it's a lot of money for our economic situation. The reasons of my phone calls to your office are based in making a deal in payments without still not receiving a call from you. Until today each month has been covered by the amount of 1,000. This is why were trying for you to understand that we can covered the amount that you guys want in different payments during the months of March through July. I hope you guys could give me a call to (775)348-66-36 to make the arrangements. And again thank you so much for taking this time for reading my letter.

RECEIVED
MAR 22 2011
BY _____

Jose Alfredo Baca & Dinora Baca
PROPERTY ADRESS: 1620 STERLING Wy.
                 RENO, NV. 89512.
OUR FILE No: 10-72000
BK CASE No: 10-51699-gWZ

Exhibit C

B6J (Official Form 6J) (12/07)

In re BACA-ESPINOSA, JOSE                    ,          Case No. _____
                    Debtor                                              (if known)

# SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

Complete this schedule by estimating the average or projected monthly expenses of the debtor and the debtor's family at time case filed. Prorate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate. The average monthly expenses calculated on this form may differ from the deductions from income allowed on Form22A or 22C.

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | |
|---|---:|
| 1. Rent or home mortgage payment (include lot rented for mobile home) | $ 975.00 |
|     a. Are real estate taxes included?    Yes _____    No _____ | |
|     b. Is property insurance included?    Yes _____    No _____ | |
| 2. Utilities    a. Electricity and heating fuel | $ 350.00 |
|     b. Water and sewer | $ 200.00 |
|     c. Telephone | $ 130.00 |
|     d. Other  internet and cable | $ 150.00 |
| 3. Home maintenance (repairs and upkeep) | $ 500.00 |
| 4. Food | $ 650.00 |
| 5. Clothing | $ 200.00 |
| 6. Laundry and dry cleaning | $ 150.00 |
| 7. Medical and dental expenses | $ 0.00 |
| 8. Transportation (not including car payments) | $ 300.00 |
| 9. Recreation, clubs and entertainment, newspapers, magazines, etc. | $ 72.00 |
| 10. Charitable contributions | $ 0.00 |
| 11. Insurance (not deducted from wages or included in home mortgage payments) | |
|     a. Homeowner's or renter's | $ 0.00 |
|     b. Life | $ 0.00 |
|     c. Health | $ 0.00 |
|     d. Auto | $ 0.00 |
|     e. Other _____ | $ 700.00 |
| 12. Taxes (not deducted from wages or included in home mortgage payments) (Specify) _____ | $ 0.00 |
| 13. Installment payments: (In chapter 11, 12, and 13 cases, do not list payments to be included in the plan) | |
|     a. Auto | $ 0.00 |
|     b. Other _____    _____ | $ 0.00 |
|     c. Other _____ | $ 0.00 |
| 14. Alimony, maintenance, and support paid to others | $ 0.00 |
| 15. Payments for support of additional dependents not living at your home | $ 500.00 |
| 16. Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ 0.00 |
| 17. Other _____ | $ 0.00 |
| 18. AVERAGE MONTHLY EXPENSES (Total lines 1-17. Report also on Summary of Schedules and, if applicable, on the Statistical Summary of Certain Liabilities and Related Data.) | $ 4,877.00 |

19. Describe any increase or decrease in expenditures reasonably anticipated to occur within the year following the filing of this document:
_____    _____
_____    _____

20. STATEMENT OF MONTHLY NET INCOME

| | |
|---|---:|
| a. Average monthly income from Line 15 of Schedule I | $ 3,123.00 |
| b. Average monthly expenses from Line 18 above | $ 4,877.00 |
| c. Monthly net income (a. minus b.) | $ -1,754.00 |



Exhibit  D

| Date Received | Funds Received | Payment / Fund Credited | Payment Satisfied | Debtor Suspense Balance | Comments | Loan Data | |
|---|---|---|---|---|---|---|---|
| | | | | | | Name. | Baca |
| 10/22/10 | $4,000.00 | $0.00 | N/A | $4,000.00 | To Suspense | Loan No. | *******9830 |
| 10/25/10 | $0.00 | $3,859.08 | 2/10-5/10 | $140.92 | From Suspense | | |
| 12/31/10 | $1,000.00 | $0.00 | N/A | $1,140.92 | To Suspense | | |
| 01/03/11 | $0.00 | $964.77 | 6/1/10 | $176.15 | From Suspense | | |
| 01/06/11 | $1,000.00 | $0.00 | N/A | $1,176.15 | To Suspense | | |
| 01/07/11 | $0.00 | $964.77 | 7/1/10 | $211.38 | From Suspense | | |
| 02/04/11 | $1,000.00 | $0.00 | N/A | $1,211.38 | To Suspense | | |
| 02/07/11 | $0.00 | $964.77 | 8/1/10 | $246.61 | From Suspense | | |
| 03/02/11 | $1,000.00 | $0.00 | N/A | $1,246.61 | To Suspense | | |
| 03/07/11 | $0.00 | $964.77 | 5/1/10 | $281.84 | From Suspense | | |

Exhibit __E__

Case 10-51699-gwz    Doc 50    Entered 03/10/11 16:29:04    Page 47 of 49

Map > Nevada > Reno > Old Northwest - West University

Views: 18

**Zestimates**

Schools

# 1620 Sterling Way

Grocery Stores

Coffee and
**eZestimate®:**  $82,000
Parks
**Value Range:**  $58K - $86K
**Monthly payment:**  $339
Restaurants
See current rates on Zillow
Gas Stations

Zillow Mortgage Marketplace provided by

No photos available for this property

| | |
|---|---|
| **Bedrooms:** | 3 |
| **Bathrooms:** | 2 |
| **Sqft:** | 1,209 |
| Lot: | 9,583 sq ft / 0.22 acres |
| Property type: | Single Family |
| Year built: | 1959 |
| Parking type: | Garage - Attached |
| Cooling system: | |
| Heating system: | |
| Fireplace: | -- |
| Last sold: | April 06 1993 |

**Drive time**

### Description

This 1209 square foot single family home has
3 bedrooms and 2.0 bathrooms. It is located at
1620 Sterling Way Reno, Nevada. This home is
in the Washoe School District. The nearest
schools are Sierra Vista Elementary School,
Traner Middle School and Hug High School.

More Facts

Post for sale/rent    Save    Share    E-mail me    Edit    Print
Map

**Charts and Data**


Exhibit F

3/9/2011 2:43 PM

| | Value | Range | 30-day change | $/sqft | Last updated |
|---|---|---|---|---|---|
| Zestimate® | $82,000 | $58K – $86K | +$9,000 | $67 | 03/08/2011 |
| My estimate | Create estimate | | | | |
| Owner Comment | Post a comment | | | | |

**Show**

⊙ **Zestimate ($)**

○ **Zestimate (% change)**

○ **Listing price**

○ **Tax assessment**

○ **Tax paid**

○ **Page views**

**Time period**

○ **1 month**

○ **1 year**

⊙ **5 years**

○ **10 years**      .

Compare Old
Northwest - West
University to nearby
areas

Click here to find out more!

**Maps and Views**

## Financing

**Can I Afford This Home?**

**Monthly Payment by Loan Type**

| Price: | $ 82,000 |
| **Down Payment:** | 100 % ( $8,200 ) |
| **Annual income:** | $ 16,371 |

| **30 Year Fixed:** | 4.68 % | $382 /mo |
| **15 Year Fixed:** | 3.93 % | $543 /mo |
| **5/1 ARM:** | 3.16 % | $317 /mo |

$543

$382

$317

Next Step: Get custom quotes

**Ads by Google**

Loan Modification Help
Free Loan Modification info. Try to Lower your Payment!

3 Credit Scores (Free)
Absolutely Free Credit Scores Instant Access To Yours Now